COMPTROLLER OF THE TREASURY, STATE OF
MARYLAND *v.* AMERICAN CYANAMID
CO., ET AL.

[No. 436, September Term, 1964.]

492

*Decided October 26, 1965.*

*Dissenting opinion filed December 1, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, OPPENHEIMER and BARNES, JJ.

*Robert J. Martineau, Assistant Attorney General,* and *Edward F. Engelbert, Chief, Retail Sales Tax Division,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for appellant.

*Morris Rosenberg* and *Stephen H. Sachs,* with whom were *Tydings & Rosenberg* on the brief, for appellees.

HAMMOND, J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at p. 508, *infra.*

If those who will have occasion to refer to this decision knew the background of the case, factual and legal, the text of this judicial sermon to the Comptroller and our holding could happily be no more than the words of Judge Offutt, for the Court, in *Horton v. Horton,* 157 Md. 127, 133: "But no practice, however generally, or however long, it may have prevailed, can override the clear and manifest meaning of a statute."

Unfortunately for us (the Court which must prepare it) and for the lawyers and their clients who must from time to time hereafter read it, some reference will have to be made to the facts, the applicable sales and use tax statutes and the rules of the Comptroller purporting to interpret those statutes.

Bloomingdale Rubber Company makes adhesives which bind together the leading edges of the wings, tail surfaces, door panels and floor panels of both commercial and military aircraft. By reason of the specifications of the purchasers, Bloomingdale must make two tests of the binding qualities of each batch of several hundred gallons of the adhesive. In one test a panel of aluminum honeycomb core three inches wide, nine inches long by five-eighths of an inch thick, is sandwiched between two skins of aluminum sheeting of the same length and width, one being glued to each face of the honeycomb core. In the other test two of the pieces of aluminum sheeting are stuck to each other by adhesive from the batch being tested. As a part of both tests, each resulting panel is subjected to temperatures of over three hundred degrees Fahrenheit and to pressures of over twenty-five pounds per square inch and then placed in a testing machine which exerts force sufficient to pull

the panel apart and records the amount of force used. The honeycomb cores cost five dollars and a quarter a pound and the sheets fifty-five and a half cents a pound. After serving in the tests, both the cores and the sheets are sold for scrap, both of these forms of aluminum having been rendered unusable by mechanical stresses which twist, stretch, bend and crumple them and by the contamination of their surfaces resulting from the coatings of adhesive which cannot practicably be removed.

Code (1957), Art. 81, Sec. 325 (enacted with different rates as Sec. 260 of Art. 81 of the Code by Ch. 281 of the Laws of 1947), imposes a tax on every retail sale of tangible personal property, as defined. The tax has been held to be an excise on the privilege of selling specified personal property at retail, to be collected by the vendor although paid by that purchaser who is the ultimate consumer, *Lane Constr. Corp. v. Comptroller*, 228 Md. 90, so as to avoid a pyramiding of the tax on the intermediate purchaser or purchasers. *Comptroller v. Aerial Products, Inc.*, 210 Md. 627.

These designs of the statute which the cases have declared are revealed throughout the Retail Sales Tax Act (the sales tax act), codified in Art. 81 of the Code. "Selling" is defined in Sec. 324 (d) as any transaction whereby title or possession, or both, of tangible personal property is, or is to be, transferred by any means whatever for a consideration. The body, or first paragraph, of Sec. 324 (f) (in language which has remained unchanged since its enactment as part of then Sec. 259 of Art. 81 of the Code by Ch. 281 of the Laws of 1947), defines "retail sale" and "sale at retail" to mean:

> "* * * all sales of tangible personal property to any person for any purpose other than those in which the purpose of the purchaser is to resell the property so transferred in the form in which the same is, or is to be received by him, or to use or incorporate the property so transferred, as a material or part, of other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining."

The purchaser whose purpose is to resell the property he buys in unchanged form or as a part or component of another

thing he will produce is not required to pay the tax since he is not the ultimate consumer, but, rather, the tax must be paid by the final purchaser of the unchanged article or of the manufactured, assembled, processed or refined thing. *Comptroller v. Fairchild Engine and Airplane Corp.*, 227 Md. 252.

Between the passage of the sales tax act and its effective date of July 1, 1947, the Comptroller promulgated a number of rules under the authority of then Sec. 301 (a) (now Sec. 365 (a)), authorizing him "to make, adopt and amend such rules and regulations as he shall deem necessary to carry out the provisions of this subtitle and to define any terms used herein." One was Rule 63 purporting to interpret then Sec. 259 (f), the rule reading (as it has continued to do) as follows:

> "The clause, 'or to use or incorporate the property so transferred, as a material or part, of other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining,' as used in Sec. 259 (f) [324 (f)] shall be deemed to include all tangible personal property which is consumed in such operations.
>
> "Tangible personal property shall be considered to be consumed in such operations if that property is materially changed in form and character, or consistency by reason of its use. Tangible personal property shall not be considered to be consumed in such operations if its value as property is ordinarily dissipated through the gradual wear or tear incident to its use. For example, the sale of coal for use in manufacturing, assembling, processing or refining is not taxable. Machinery and small tools for use in manufacturing, assembling, processing or refining are taxable."

We were told at the argument by the representative of the Comptroller, who was the representative of the Comptroller's office in 1947, that during the passage of the act through the regular Legislature of 1947, a passage which was brought about only after determined and unrelenting administrative pressures had overcome bitter and sustained resistance, the

Legislative agents of those who sold fuels other than coal used in producing tangible personal property for sale had persuaded the Legislature to amend the bill to provide in then Sec. 259 (f) (4) that the term "sale at retail" should include: "The sale of natural or artificial gas, oil, electricity or steam, when made to any purchaser for purposes other than resale or for use in manufacturing, assembling, processing or refining," and that the producers and sellers of coal were disturbed and irritated because that fuel was not similarly excluded from taxability. After passage of the sales tax act, the administrative officials discovered that there was a possible, indeed in their view, a very probable infirmity in the title of the act under the holding of this Court in *Buck Glass Co. v. Gordy,* 170 Md. 685, which under judicial attack might eliminate the tax on sales other than conventional retail sales of small amounts. The consequence would be that wholesale sales as commonly understood would be excluded from taxability and so deprive the State of a large part of the revenues it had been expected the act would produce. To forestall attack on the act by the producers and vendors of coal, the Comptroller adopted Rule 63 which in purported effect amended then Sec. 259 (f) so as to add coal to other power or heat producing items used in the process of producing goods for sale.

Offered in evidence was a bulletin or notice of the Comptroller which was prepared in July 1947 and immediately sent to all persons, firms and corporations holding a sales or use tax license as required by the sales tax act and the complementary Maryland Use Tax Act (use tax act). It said in part:

"1. A Resale Certificate should be issued on the property being purchased if purchased for resale 'as is', or for resale as a part or material of a product produced for sale by manufacturing, processing, assembling or refining.

"The Comptroller has *extended* 'materials which are purchased for incorporation into a product produced for resale' to include such materials as are consumed in producing for resale products by manufacturing, assembling, processing or refining. Property shall be

considered to be consumed in such operation if that property has materially changed in form and character or consistency by reason of its use. Property shall not be considered to be consumed in such operations if its value as property is ordinarily dissipated through the gradual wear or tear incident to its use.

"The above rule means that you may issue a Resale Certificate for property which is consumed. For example, coal that is used in manufacturing, assembling, processing or refining, since after coal is burned it no longer exists as coal, but has been changed in form and character. However, machinery and tools and other items used in manufacturing are taxable, since they are not consumed within the definition of the rule, but even after they have been worn out still retain their original form and character and their consistency. A worn out tool is still a tool." (Emphasis added.)

To cure the dangers inherent in an infirm title and to give equality of treatment to coal, the Legislature was called into session on November 5, 1947, and passed Ch. 2 of the Laws of the Special Session of that year, repealing and reenacting subsection (f) of Sec. 259 of Article 81 of the Code, as said subsection was enacted by Ch. 281 of the Acts of 1947 (under a title that left no doubt that the terms "retail sale" and "sale at retail" included the sale of tangible personal property or service, as defined, in any quantity or quantities) to provide, among other things, in a new Sec. 259 (f) (4) that not only gas, oil, electricity or steam but also coal were not to be taxable if used in the process of producing goods.

Against this background Bloomingdale and American Cyanamid Co., which bought the assets and assumed the liabilities of Bloomingdale as of May 17, 1963, say that the tax of $1,348.50 on aluminum purchased for the testing of batches of adhesive between July 1, 1956 and December 31, 1961, which Bloomingdale paid upon being assessed therefor, and the similar tax in the amount of $970.84 for the period from January 1, 1962 to April 11, 1963, which American paid upon an assessment against Bloomingdale made on June 13, 1963, were not due and should

be refunded. Their first argument is that while concededly Bloomingdale did not "incorporate" the aluminum as a "material or part" of the adhesive it manufactured, it did "use" the aluminum as a part of or in connection with the manufacturing process because it thus "used up" the aluminum; that if the word "use" is not given the meaning "to use up in the process of producing goods for sale," it is the equivalent of "incorporate" and surplusage, and this construction is not to be presumed; and must be avoided if possible and, therefore, the section is at least ambiguous and should be construed in favor of the taxpayer and against the State since the sales are exclusions from the scope of the taxing statute and not exemptions under *Baltimore Foundry and Mach. Corp. v. Comptroller*, 211 Md. 316, 319-320, and *Fair Lanes, Inc. v. Comptroller*, 239 Md. 157. The second argument of the taxpayers is that the aluminum is consumed in the process of the manufacturing operation and is therefore non-taxable under the explicit specifics of Rule 63.

The Comptroller denied the refund for the period from 1956 to 1961 on the ground that the aluminum did not become a part of the adhesive as Sec. 324 (f) requires if it is to be non-taxable, and was not consumed under Rule 63 since it was not changed in form, character or consistency. He denied the refund for the period from January 1, 1962 to April 11, 1963 because no protest against the assessment was made within thirty days, as required by law.

Judge Sodaro agreed in essence with the taxpayer both as to the construction of the statute and the applicability of Rule 63, finding it unnecessary to pass on the timeliness of the protest, and ordered a refund for both periods.

We think (a) the statute is plain, clear and unambiguous and means that unless a purchase is made for the purpose of resale in unchanged form or as a part or component of other tangible personal property to be produced for sale, it is taxable; (b) the aluminum is consumed by its use in testing the adhesive and its purchase would not give rise to taxation if Rule 63 were a valid interpretation of the statutes; and (c) Rule 63 unlawfully extended the exclusions from taxation provided by Sec. 324 (f) and goes beyond the power given the Comp-

troller to carry out the legislative directions in the sales tax act and to define terms and is invalid.

Sec. 324 (f) excludes from tax only property bought for the purpose of resale in the same form or with intent "* * * to use or incorporate the property * * *, as a material or part, of other tangible personal property to be produced for sale * * *." In *Armco Steel Corp. v. State Tax Comm'n,* 221 Md. 33, 43-44, we interpreted the words "for processing or refining purposes" and recognized the rule of statutory construction that where two or more words are grouped together, and ordinarily have a similar meaning but are not equally comprehensive, the general word is limited and qualified by the special word—so that under this rule "processing" would be a synonym of "refining"—but we held the governing rule of statutory construction there to be that "* * * before words can be regarded as surplusage it must be clear that the enacting body could not possibly have intended the words to be in the legislation." In the case before us it is obvious that under either test the Legislature specified that the property bought for resale had to remain unchanged or become an ingredient or part of another article in order to be excluded from tax. If "incorporate" limits and qualifies "use," there must be a uniting or blending together of an article bought to aid in producing another article for sale, or an absorption of the first by the second. This concept of "incorporate" would remain if the words "use" and "incorporate" are read as having been intended to have similar but different meanings, but "use" would vary from the ordinary connotation of "incorporate" and mean a utilization of, a making use of, or an employment for the purpose of using the article purchased as a material or part of the product being made for sale. For example, the ingredients used to make the adhesive in this case would ordinarily and customarily be considered as incorporated into the final product. On the other hand, if paint were applied to cover the whole or part of an article being produced, it would be apt and perceptive to say that the paint was used as a material of the finished product, not that it was incorporated into that product. If one were describing, in the words of Sec. 324 (f) what the purpose was of a maker of automobiles, lawn mowers, wheelbarrows, or outdoor

grills in buying from a parts manufacturer wheels to be attached to his product, it would be customary and natural to say that he intended to use the wheels as parts of his vehicles or appliances, not that he was incorporating them. This reading of the words "use" and "incorporate," as employed in Sec. 324 (f), is in accord with dictionary definitions of the words. Funk and Wagnalls Standard Dictionary of the English Language defines "incorporate" to mean "to combine together * * * so as to form one harmonious or consistent whole." It defines "use" to mean, as a first meaning, "to employ for the accomplishment of a purpose—turn to account—make use of." The Oxford Dictionary says "incorporate" means "to combine or unite into one body or uniform substance; to mix or blend thoroughly together * * *." It defines "use" as meaning "to employ or make use of (an article, etc.), esp. for a profitable end or purpose; to utilize, turn to account." An illustration of this definition is "In the manufacture of surgeons' instruments * * *, the very best steel * * * should be exclusively used."

We think the plain and manifest meaning of the initial paragraph of Sec. 324 (f) leaves no room for a holding that the words "* * * to use * * *, as a material or part, of other tangible personal property * * *" mean a using up of the property purchased as a part of the process of producing other tangible personal property, or as having any meaning other than that spelled out in the statute.

Our conclusion is fortified by other provisions of the sales tax act and the complementary use tax act. Sec. 324 (f) (3) provides that a "sale at retail" shall include "the sale of tangible personal property to contractors, builders or landowners for use or resale in the form of real estate," thus defining the final utilizer of the tangible personal property as such as its ultimate consumer and, so, liable for the sales tax. Sec. 326 (a) exempts from sales taxes sales to the State of Maryland or to any of its political subdivisions. The Comptroller's Rule 70 provided in part that contractors who are performing jobs for the State or any of its political subdivisions on a lump-sum basis "* * * are not required to pay the tax on materials and supplies which will be incorporated into the job * * *. The contractor must pay the tax on all equipment which he purchases even though

it may be used on a job for one of the aforementioned persons." A circular letter of the Comptroller advised interested persons that those performing lump-sum contracts with the State or a subdivision "may purchase tax free the materials which will actually be incorporated into and remain a part of the completed job. The tax must be paid on all materials, supplies and equipment which are not incorporated and do not remain as a part of the completed job, for example: form lumber, dynamite, rubber boots and other clothing, tools and equipment, etc." *Comptroller v. Joseph F. Hughes Co.,* 209 Md. 141, 144. Following *John McShain, Inc. v. Comptroller,* 202 Md. 68, it was held in *Hughes* that Rule 70 was valid on the point—since an exempt person became the owner of the real estate into which the personal property went and would have paid no tax had it bought the personal property itself, and that Hughes, under a lump-sum contract with the City of Baltimore, must pay the tax on form lumber for concrete, nails and hardware used in the form lumber, muriatic acid for cleaning bricks, fuel for temporary heating (all claimed to be destroyed by their use), and photographs of the building's progress, and special bits for tools. Rule 63 was urged on the Court by Hughes to support its claim that personal property consumed in the process of production of things for sale were excluded from tax. We said: "We find it unnecessary to pass on the validity of this Rule." *Hughes, supra,* at 148.

When the use tax was enacted at the regular session of the Legislature in 1947, after the sales tax became law, then Sec. 310 (f) of the use tax act exempted from tax, among other things, tangible personal property not readily obtainable in Maryland which was used in the State by one manufacturing "* * * any article, substance or commodity, if such tangible personal property enters into the processing of or becomes an ingredient or component part of the product * * * which is manufactured, compounded or furnished * * *."

In *Compt. of Treasury v. Crofton Co.,* 198 Md. 398, 404, Judge Markell, for the Court, said:

"* * * section 310 (f), however narrowly construed, would not be a mere duplication of section 308 (d)

(2) and (e) (2) [of the use tax act] [1] since the latter are applicable only to incorporation of personal property 'as a material or part of other tangible personal property to be produced for sale by manufacturing', whereas section 310 (f) is applicable if the personal property 'enters into the processing of *or* becomes an ingredient or component part of the product'. On the other hand, whether broadly or narrowly construed, section 310 (f) does in part duplicate section 308 (d) (2) and (e) (2). Furthermore, to the extent that section 310 (f) is not a duplication of section 308 (d) (2) and (e) (2), it is an exemption new in the Use Tax Act and *without a parallel in the Retail Sales Act* [Judge Markell had earlier indicated that Sec. 259 (f) of the sales tax act and Sec. 308 (d) (2) and (e) (2) of the use tax act were essentially identical] *and is a departure from the basic purpose of the act to complement the retail sales tax by a compensatory tax."* (Emphasis added.)

This passage is a clear statement by this Court in 1951, four years after the passage of the sales and use tax acts, that then Sec. 259 (f) of the sales tax act (now Sec. 324 (f)) did not mean that property was excluded from the sales tax if it "enters into the processing of" an article being manufactured, but that said section means that to be excluded, the property must become "an ingredient or component part of the product." This makes untenable the contention of the appellees as to the meaning of Sec. 324 (f) which was adopted by Judge Sodaro. Further, in *Baltimore Foundry & Mach. Corp. v. Comptroller,* 211 Md. 316, 319, this Court referred to the exclusion in Sec. 324

---

1. Sec. 308 (d) (2) (now Sec. 372 (d) (2) ) provides that the term "use" "* * * shall not include the following: * * * The incorporation of tangible personal property as a material or part of other tangible personal property to be produced for sale * * *." Sec. 308 (e) (2) (now Sec. 372 (e) (2)) provides that the term "storage" "* * * shall not include the following: * * * The keeping * * * in this State of tangible personal property for the purpose of incorporating said property as a material or part of other tangible personal property to be produced for sale * * *."

(f) (then 320 (f)) as applying to property purchased "* * * for the purpose of incorporation into a finished product * * *." See also *Comptroller v. Fairchild, supra,* where Judge Henderson, for the Court, held that personal property bought by Fairchild which became a part of missiles sold to the Government for testing was not subject to sales or use tax. He referred to Code (1957), Art. 81, Sec. 372 (d) (2) (former Sec. 308 (d) (2)) of the use tax act (in which "use" is defined as not including property held for "the incorporation of tangible personal property as a material or part of other tangible personal property to be produced for sale * * *") and Sec. 324 (f) (former Sec. 259 (f)) of the sales tax act, and said of Sec. 372 (d) (2): "Almost identical language is used in Code (1957), Art. 81, sec. 324 (f) in regard to sales at retail, and we shall treat the two together. The taxes are, of course, complementary."

The use tax act of the District of Columbia contains the identical language found in Sec. 324 (f). In *Briggs & Co. v. District of Columbia,* 196 F. 2d 241, 243, the Court of Appeals for the District of Columbia held that cellulose casings used and consumed in the manufacture of frankfurters for sale were taxable to the manufacturer. The Court said:

> "Much could be said in favor of exempting from the coverage of the statute property used in the sense of being consumed in the manufacturing process where, as here, the value of the casing so used is represented in some part at least in the finished product * * *. See Western Cartridge Co. v. Smith, 2 Cir. 1941, 121 F. 2d 593. But the statutory language does not, as in the cited case, exempt an article used 'as material in the manufacture of' another article, but only one used as a 'material or part of' the other or incorporated in it."

To the argument that Congress had adopted the Maryland statute verbatim for the District of Columbia and therefore Rule 63 controlled the meaning of the District counterpart of Sec. 324 (f), the Court took the view that for this to be so the construction of the adopted statute must have been by the highest

judicial authority of the originally enacting state and said: "But at least in the absence of a more settled interpretation, or one of high state judicial authority, we are free to apply the District statute differently."

It is apparent that when the Maryland Legislature desired that personal property consumed in the making of other personal property should be excluded from the coverage of the sales or use tax, it stated its desire so clearly that there could be no doubt of its intent. Not only did it do so in then Sec. 310 (f) of the use tax act ("* * * if such tangible personal property enters into the processing of or becomes an ingredient or component part of the product * * *"), construed in *Crofton,* but it also did so in Sec. 259 (f) of the sales tax act as first enacted, now as Sec. 324 (f), the critical statute in the case. In Sec. 259 (f) (4) it made taxable "the sale of natural or artificial gas, oil, electricity, or steam, when made to any purchaser for purposes *other than resale or for use in manufacturing, assembling, processing or refining."* (Emphasis added.) It is highly significant that when the attention of the Legislature was directed to the problem caused by the statute's failure to exclude coal from taxation and the Comptroller's attempt to extend the statute by rule to so exclude coal, the Legislature did not, at the Special Session of 1947 or thereafter, change the language of exclusion in the first paragraph of then Sec. 259 (f)—"* * * to use or incorporate * * *, as a material or part," of a product made to be sold to conform to the comptroller's extension of the language's meaning. Rather, the lawmakers added coal to the list of items excluded from tax by subparagraph (4) of Sec. 259 (f) if such items were purchased "* * * for use in manufacturing * * *."

There remain the questions of the effect of administrative interpretation of Sec. 324 (f) and of possible legislative acquiescence in that interpretation. It is well settled by many cases that where the language of a statute is ambiguous and uncertain a contemporaneous construction which has been consistent and unchallenged, although it is not controlling, may be resorted to as an aid in determining the legislative intent and will not be overturned except for cogent reasons, particularly

where there have been subsequent legislative reenactments without change of the language construed.[2]

We think these propositions do not control the decision here. In our view the purpose of the Legislature in enacting the critical language of Sec. 324 (f) is evident and the expression of its intent clear and manifest. Since we find no ambiguity or uncertainty in the statute, there is no need to look beyond its words to find its meaning. We do not regard the promulgation and continued existence of the Comptroller's Rule 63 as a consistent and unchallenged administrative interpretation and practice because the Legislature at the Special Session of 1947 did not indicate agreement with the Comptroller's position that coal, the *raison d'être* of Rule 63, was excluded by the language of the body of then Sec. 259 (f) changing the language of the body of that section to read that property consumed by its use in the process of making another tangible product is excluded from taxation, but, rather, amended the law to put coal in the special category of gas, oil, electricity and steam (which were originally excluded from tax by Sec. 259 (f) (4)) if purchased "for use in manufacturing," and so forth.

The Comptroller's Rule 63, according to the bulletin which was issued to explain it, did not purport only to carry out the sales tax act or to define the terms used therein but to "extend" the meaning and effect of the legislative provisions, and so to exclude from taxation something the Legislature had subjected to tax. There can be no challenge to the proposition that the Comptroller cannot by rule or otherwise make taxable that which the Legislature has excluded or exempted from taxation and cannot exclude or exempt that which the law says is taxable.

The administrative interpretation of Sec. 324 (f) made by Rule 63 has not been the interpretation given to that section by this

---

2. Dvorine v. Castelberg Jewelry Corp., 170 Md. 661, 675; Wells v. Price, 183 Md. 443, 457; Smith v. Higinbothom, 187 Md. 115, 132-33; Bosley v. Dorsey, 191 Md. 229, 239; Department of Tidewater Fisheries v. Sollers, 201 Md. 603, 615; Comptroller v. Joseph F. Hughes Co., 209 Md. 141, 145; Kimball-Tyler Co. v. Mayor & C. C. of Baltimore City, 214 Md. 86, 99; Liss v. Goodman, 224 Md. 173, 179.

Court. In *Crofton* we said in 1951 (without referring to the Rule in terms) that Sec. 259 (f) did not mean what Rule 63 said it meant by extension of the legislative meaning and, subsequently, similarly indicated the same view in *Aerial Products* and *Fairchild*.

We conclude that the controlling rule of law which must be applied here is that expressed in the quotation from *Horton*, with which this opinion began. It was paraphrased at greater length and applied in imposing an inheritance tax in *Bouse v. Hutzler*, 180 Md. 682, 687, as follows:

> "Nevertheless, even if there had been an unvarying practice, the Court of Appeals would not sanction a method of calculation which would tolerate an evasion of taxes payable to the treasury of the State. It is quite true that where the language of a statute is ambiguous and susceptible of two reasonable constructions, a long and unvarying administrative practice has a very persuasive influence, if not an entirely controlling effect, upon the judicial construction of the statute. But the rule of contemporaneous construction does not preclude an inquiry by the courts into the correctness of such a construction. Where the language is clear and explicit, and susceptible of a sensible construction, it cannot be controlled by extraneous considerations. No custom, however long and generally it has been followed by officials, can nullify the plain meaning and purpose of a statute. An administrative practice contrary to the plain language of a statute is a violation of the law; and a violation of the law, even though customary, does not repeal the law."

In *Rogan v. Baltimore & O. R. R.*, 188 Md. 44, 58, in upholding a method of computation of tax contrary to the unvarying practice for sixty years, this Court said:

> "No custom, however venerable, can nullify the plain meaning and purpose of a statute. * * * In spite of an unvarying administrative practice, the Court should not sanction a method of computation which tolerates

an evasion [or avoidance] of taxes. Any alleged failure of taxing officials in previous years to assess the gross receipts accurately cannot abolish the duty imposed by law upon their successors, or control the judicial construction of the statute."

Judge Prescott, for the Court, cited *Rogan* in *Stembler and Ford, Inc. v. Capitol Heights,* 221 Md. 113, 117, and said: "[I]f the language is plain and free from ambiguity and has a definite and sensible meaning, such is *conclusively* presumed to be the meaning of the legislative body in enacting the statute or ordinance." *County Treasurer v. State Tax Comm'n,* 219 Md. 652, 657, held that a custom of thirty years standing could not control the statute to the contrary since there was no ambiguity in the law. "Administrative construction is called into play only when two reasonable interpretations of the act to be construed are possible. 'But where the language is plain and unambiguous, the judicial construction cannot be controlled by extraneous considerations.' "

In several sales or use tax cases we have applied the principle of these cases and have held rules or parts of rules of the Comptroller as to sales or use taxes to be invalid because they varied the law. Part of Rule 61 was invalidated in *Comptroller v. M. E. Rockhill, Inc.,* 205 Md. 226, 234-35. In *Comptroller v. Pittsburg-Des Moines Steel Co.,* 231 Md. 132, 136, Judge Prescott for the Court said of that part of Rule 70 which discriminated against the federal government in favor of the government of the State and its subdivisions: "The Comptroller has no power or authority to create an exemption by Rule. Rule 70 derives whatever force it has from the fact that it is a correct interpretation of the statutes promulgated by the Legislature" and held that the second paragraph of Rule 70 was null and void insofar as it purported to tax contractors under lump-sum contracts with the federal government. *Cf. Steiner Constr. Co. v. Compt. of Treas.,* 209 Md. 453, 469, where Chief Judge Brune for the Court said:

"If the provisions of Rule 53 relating to Class (d) contracts therein described would produce in this case a result at variance with the views above expressed,

they would, we think, go beyond the permissible limits of administrative interpretation, since they would, on the facts of this case, nullify the applicable statutory definition of the term 'sale at retail' and would grant an exemption where the statutes grant none."

The claims of the appellees to refunds must be denied because of the clear and manifest purpose and meaning of Sec. 324 (f).

> *Orders of the Baltimore City Court appealed from reversed, with costs, and orders of the Comptroller denying refunds to the appellees reinstated.*

BARNES, J., filed the following dissenting opinion.

The majority indicates in its opinion in this case that the text of its "judicial sermon" to the Comptroller is "But no practice, however generally, or however long it may have prevailed, can override the clear and manifest meaning of a statute." In my opinion, if we are still constitutionally permitted to preach a judicial sermon—even to the Comptroller — the wrong text was selected and, perhaps the majority has even considered the wrong chapter. I suggest that the correct text would be:

> "* * * [I]f there is no clear indication to the contrary and if it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless, or nugatory."
> *Thomas v. Police Commissioner of Baltimore City,* 211 Md. 357, 361, 127 A. 2d 625, 627 (1956).

It appears to me that in construing Sec. 324(f) the majority is in error by failing to give effect to the *purpose* of the definition in Sec. 324(f) which was to avoid the pyramiding of taxes which would result from the taxation of material used up in the manufacturing process of a product, the cost of which necessarily would be included in the amount of the taxable sale of

the finished product. In this regard the Maryland definition is in accord with a similar purpose in the tax laws of other states. See the helpful annotation at 157 A.L.R. 804 entitled *Construction and application of exemption on deduction provisions of general sales tax act*. At page 820 of this annotation the following is stated:

> "In order to prevent the pyramiding of taxes on the same commodity when it is sold in a different form after it is processed *or when it is used in the manufacturing of a more or less different character of commodity,* the sales tax statutes usually contain a provision, widely varying in form, which in terms or in effect exempts the sale of such commodity from the sales tax *in anticipation that the finished product or the new product manufactured from such commodity will, when ultimately sold, share its burden of the tax.* This provision usually requires that the commodity to be exempt from the tax must be *used in* the manufacturing and/*or* become a component or integral part of the manufactured or processed article." (Emphasis supplied).

The construction adopted by the majority results in a pyramiding of taxation, as the Comptroller collects the sales tax on the aluminum used up in the manufacturing of the adhesive, and the Comptroller then collects the sales tax on the finished product into which the value of the aluminum has wholly gone. It thus frustrates one of the cardinal canons of statutory construction, i.e., that to determine the intention of the legislature, the Court should consider the object and purpose of the legislation, the ends to be accomplished and the resulting consequences from one meaning rather than another meaning. As Judge Hammond, for the Court, aptly stated in *Tyrie v. Baltimore County,* 215 Md. 135, 140, 137 A. 2d 156, 158 (1957):

> "In determining the legislative intent we must consider the tests which have been set up to aid proper reading in doubtful cases. These include not only consideration of the literal or usual meanings of the words used but their meaning and effect considered in the

light of the setting, the purposes of the enactment, the ends to be accomplished, and the consequences that may result from one meaning rather than another."

Is such a frustration of the legislative purpose required by the language of Sec. 324(f)? I think not. By using the verb "to use" in the alternative ("or") to the verb "to incorporate," the legislature must have intended it to have some meaning to carry out the legislative purpose. In recognized and authoritative dictionaries[1] the verb "to use" has the following accepted meanings: "to use up * * * to consume or exhaust by using"; "to expend or consume by putting to use"; "to consume, expend or exhaust by use (often with *up*)"; "to consume or expend by using." On the other hand, "to incorporate" may mean "to unite intimately; to blend," but it may also mean "to assimilate, to combine into a structure or organization"; or "making [something] a part of something else"; or "to combine or join with something already formed; to make part of another thing."

In my opinion, the indication by the majority of a narrow application of the verb "to use" with the subsequent language of Sec. 324(f) "as a material part, of other tangible personal property to be produced for sale by *manufacturing,* assembling, *processing* or *refining,*" as confined to parts placed on an unfinished product or paint applied to the unfinished product, is not persuasive. These illustrations fit comfortably within the definitions of "to incorporate," and to all intents and purposes this construction by the majority eliminates the verb "to use" from the section. This runs counter to the well established maxim for the construction of statutes, i.e., that the statute should be construed to give effect, if possible, to every word in it, so that no part of the statute will be superfluous or inoperative. *Thomas v. Police Commissioner of Baltimore City, supra.*

In Sec. 324(f) there not only is "no clear indication to the contrary" but, in my opinion, it is most reasonable to give

---

1. Webster's New 20th Century Dictionary, Unabridged (2nd ed.); Webster's New International Dictionary, Unabridged (2nd ed.); Webster's Third International Dictionary, Unabridged; and The Thorndike-Barnhart Dictionary.

effect to the verb "to use" as meaning "to use up," "exhaust," "expend" or "consume."

It is interesting to note that the meaning of the verb "to use" which in my opinion is the correct one and the one intended by the General Assembly, is also the one which two of the leading tax services give it. In Prentice-Hall, in referring to Sec. 324-(f) it is stated: "Sales to manufacturers and producers are exempt from tax if the item is to be incorporated into a product to be sold, *or if used up in the manufacturing process.*" (Emphasis supplied).[2] The Commerce Clearing House service gives an even broader interpretation to the definition of a "retail sale." It is stated that: "A 'retail sale' or 'sale at retail' is one in which tangible property is sold * * * for purposes other than those of resale *or use of property in producing other property* by manufacturing, assembling, processing or refining." (Emphasis added).[3] While, of course, the interpretation given tax statutes by well-recognized tax services is not conclusive, it is entitled to weight in considering the problems of construction as it represents an informed and objective viewpoint relied upon not only by members of the bar but by many members of the general public who are interested in the problem.

Can it be said under these circumstances that this provision of Sec. 324(f) is not *at least* ambiguous? I think this is the least that can be said and the Comptroller, between the passage of the Retail Sales Tax Act and its effective date (July 1, 1947) promulgated Rule 63 to interpret the very language now in question.[4] The provisions of this Regulation are set forth in the majority opinion and need not be repeated here except to note that the very clause now in question "shall be deemed to include *all tangible personal property* which is *consumed in such operations.*" (Emphasis supplied). This authoritative interpretation of the clause has continued without change

---

2. 4 P-H, State and Local Tax Serv. Md. ¶21,170.

3. C.C.H. Maryland Tax Cas. Rep. ¶60-016.

4. The Comptroller has the rule-making authority under Sec. 365(a) (then Section 301(a) ) of the Retail Sales Tax Act, and this power specifically includes the power "to define any terms used herein."

for some 18 years. Indeed, the General Assembly amended this very section in the Extraordinary Session of 1947 (Chapter 2, approved and effective as an emergency law on November 10, 1947), several months after the promulgation of Rule 63 and did not change the language in question. This long continued and unvarying construction applied by the Comptroller from the time the statute first became effective is a persuasive one in determining judicial construction. As Judge Delaplaine, for the Court, stated in *Department of Tidewater Fisheries v. Sollers,* 201 Md. 603, 615, 95 A. 2d 306, 311 (1953) :

> "It is true that no custom, however long and generally it has been followed by administrative officials of the State, can nullify the plain meaning and purpose of a statute. But where the language of a statute is susceptible of two constructions, *a long continued and unvarying construction applied by administrative officials is a persuasive influence in determining the judicial construction, and it should not be disregarded except for the strongest and most urgent reasons."* (Emphasis supplied).

See also *Shapiro v. City of Baltimore,* 230 Md. 199, 216, 186 A. 2d 605, 614 (1962).

Not only do we have unvarying administrative construction by Rule 63 for approximately 18 years, but the General Assembly, although amending the Retail Sales Act in various particulars (including the very section involved in the case at bar as has been noted), did not change this interpretation. This, in itself, furnishes a strong presumption that the statute has been construed correctly by the administrative authority. *Department of Tidewater Fisheries v. Sollers,* supra. See also *Comptroller v. Joseph F. Hughes Co.,* 209 Md. 141, 145, 120 A. 2d 343, 346 (1956) ; *John McShain, Inc. v. Comptroller,* 202 Md. 68, 73, 95 A. 2d 473, 474 (1953) ; *Smith v. Higinbothom,* 187 Md. 115, 133, 48 A. 2d 754, 763 (1946).

The majority seems to take comfort for its interpretation from the remaining portion of Sec. 324(f) and sections of the Maryland Use Tax, as well as from prior decisions of this Court construing provisions of the Use Tax Act. In my opinion they can give the majority no comfort.

The remaining portion of Sec. 324(f) seems to me to confirm the construction given by the Comptroller to the important words involved in the case at bar. Chapter 281 of the Acts of 1947 which imposed the original Retail Sales Act, provided in Sec. 259(f)—now Sec. 324(f)—as follows:

"(f) 'Retail sale' and 'sale at retail' means *all* sales of tangible personal property to any person for any purposes *other* than those in which the *purpose of the purchaser* is to resell the property so transferred in the form in which the same is, or is to be received by him, *or to use or incorporate* the property so transferred, as a *material* or part, of *other tangible personal property to be produced for sale* by *manufacturing,* assembling, *processing* or refining. For the purposes of the tax imposed by this sub-title, the term 'sale at retail' *shall include but shall not be limited to* the following:

"(1) The sale for consumption on the premises of any meals, food or drink or other tangible personal property for a consideration, at any restaurant, hotel, drug store, club, resort, or other place at which meals, food, drink or other tangible personal property are served to the public.

"(2) Any production, fabrication or printing of tangible personal property on special order for a consideration.

"(3) The sale of building materials to contractors, builders or landowners for use or resale in the form of real estate.

"(4) The sale of *natural or artificial gas, oil, electricity, or steam,* when made to any purchaser for purposes *other* than resale or for use in *manufacturing,* assembling, *processing* or *refining.*

"(5) The sale or charges for any room or rooms, * * * etc." (Emphasis supplied).

It is clear, I think, from the very language of this section that the enumeration of gas, oil, electricity or steam other than *for use* in manufacturing, assembling, processing or refining—

all of which are usually consumed or "used up" in the manufacturing or refining process—is not intended to be a closed or exclusive list. In other words, "coal," although not enumerated in Sub-section (4), would be *included* in the definition of "sale at retail," when made for purposes other than for use in manufacturing, etc. Nuclear power would be in the same position and any other like item. One need go no further than to observe that this is what the section says specifically.

It will be noted also that when the General Assembly excluded the specific items generally consumed or used up in the manufacturing process, it used the language *"for use* in manufacturing," etc. As to unspecified items, however, there might be doubt or ambiguity as to whether such items were indeed used in manufacturing in order to be included in the statutory exemption (for example, tools used but not consumed vs. coal which is consumed in the process), which was the very reason the Comptroller interpreted the phrase "to use" in Rule 63 as being deemed "to include *all* tangible personal property which is *consumed* in such operations." The example of "coal" is then given—not as the exclusive operation of Rule 63, which applied to *all* tangible property so consumed—but merely *as an example,* as the Rule states.

The Maryland Use Tax however, came into the Maryland law by an entirely different Act, i.e., Chapter 681 of the Acts of 1947. While complementary in some respects to the Retail Sales Act, it differs in a number of respects from it. There are considerations of policy in regard to, and of application of, the Maryland Use Tax which do not apply to the Retail Sales Act which most likely account for their separate sub-titles in Article 81 of the Code,[5] and for their amendments, from time to time, by entirely separate Acts of Assembly. A very important *difference* between the two Acts is in the definition of "retail sale" or "sale at retail." This definition in the Retail Sales Act *leaves out entirely* the exclusion beginning with the words "other than those in which the purpose," etc. (the important

---

5. Retail Sales Act, Code Art. 81, Secs. 324-371; Maryland Use Tax, Code Art. 81, Secs. 372-401. They have separate provisions setting forth "definitions" and separate sections providing for "exemptions."

words in the case at bar) and contains three, instead of five specific items. In the 1947 Act it read as follows:

"308(h) 'Retail sale' and 'Sale at retail' mean all sales of tangible property whether within or without this State to any person for the purpose of use, storage or consumption within this State. For the purposes of the tax imposed by this sub-title, the term 'sale at retail' shall include but shall not be limited to the following:

"(1) Any production, fabrication or printing of tangible personal property on special order for a consideration.

"(2) The sale of building materials to contractors, builders or landowners for use or resale in the form of real estate.

"(3) The sale of natural or artificial gas, oil, electricity, or steam, when made to any purchaser for purposes other than resale or for use in manufacturing, assembling, processing or refining."

It will thus be seen that the *general language of exclusion* in Sec. 259(f) of Chapter 281 of the Acts of 1947 does not appear at all in Sec. 308(h) of Chapter 681 of the Acts of 1947. In other words, the definition in the Retail Sales Act *contained a general exclusion* followed by a nonexclusive list of particular items, whereas, the definition in the Maryland Use Tax contained *no such general exclusion* but contained only the specific exclusion mentioned in Sub-paragraph (3). It is to be assumed that this difference in language was deliberately made. It would be a reasonable hypothesis to assume that it was made in order to prevent a possible economic discrimination against Maryland manufacturers *vis-a-vis* out-of-state manufacturers. It seems clear that out-of-state manufacturers possibly pay no Maryland use tax on materials purchased by them outside of Maryland and used up or consumed in the manufacture of the product ultimately sold by them for use in Maryland. The use tax is calculated on the price of the completed product which does not have to compensate the out-of-state producer for any Maryland tax on tangible personal property used up or consumed in

the manufacturing process. On the other hand, but for the general exclusion in the Retail Sales Act unspecified materials used up or consumed in the manufacturing process would be subject to Maryland Sales Tax and this additional cost would enter into the cost of the product requiring a higher price for the Maryland product than that charged by the out-of-state manufacturer of the identical product. In other words, the difference in the language of the two Acts was most likely thought necessary for equality of treatment and to make the two Acts truly complementary. It is not without irony, that the holding by the majority defeats this purpose.

It should be noted also that there is no definition of "use" in the Retail Sales Act, while there is an elaborate definition of "use" in the Maryland Use Tax Act. (Section 308(d) of Chapter 681 of the Acts of 1947).

I am not impressed with the argument that because the General Assembly at the Special Session of 1947 amended both Acts to include "coal" with the specific items excluded by both Acts, this manifested an intention that the general exclusion did not already include "coal" by virtue of its language and Rule 63. This specific inclusion was not necessary, but desirable in the Retail Sales Act;[6] it was necessary for exclusion in the Maryland Use Tax Act, as there was no general exclusion which would otherwise apply to coal or any other fuel or substance consumed in the manufacturing process. As has been stated, the failure to amend the language granting the general exclusion with the presumed knowledge of the interpretation of that general language by the Comptroller in Rule 63 is evidence of an adoption or acquiescence of the General Assembly in the Comptroller's interpretation.

Then too, it is manifestly reasonable when the sale occurs in Maryland to give the same exclusion to similar items consumed in the manufacturing process as it is to give it to the specifically enumerated items as the cost, in either case, is wholly in-

---

6. The coal users would naturally prefer a specific exclusion written into the statute to a dependence on the Comptroller's Regulation which could be modified or abrogated by the Comptroller much more quickly and much more easily than an amendment of the Retail Sales Act by the General Assembly.

cluded in the finished product on which the retail sales tax is paid by the ultimate purchaser. This is what the General Assembly intended to accomplish and this was recognized and made plain by Rule 63.

In my opinion, the prior cases of this Court cited by the majority do not support its construction of Sec. 324(f). None of the cases construes the language of Sec. 324(f) (or its predecessor sections) directly and none purports to make a holding in regard to the particular language involved in the case at bar.

Both *Armco Steel Corp. v. State Tax Commission,* 221 Md. 33, 155 A. 2d 678 (1958) and *John McShain, Inc. v. Comptroller, supra,* involved the *exemption sections* of an Ordinance of the Mayor and City Council of Baltimore No. 643, approved December 5, 1956 or the Retail Sales Act and the Maryland Use Tax, respectively. There was no consideration in either case of the *exclusions* in Sec. 324(f). It should be remembered that in construing tax statutes provisions of the law in regard to the *scope* of the tax are strictly construed in favor of the taxpayer and against the State, while provisions of the law in regard to exemptions are strictly construed in favor of the State and against the taxpayer. As Judge Marbury stated, for the Court, in *Fair Lanes, Inc. v. Comptroller,* 239 Md. 157, 162, 210 A. 2d 821, 823 (1965):

> "In interpreting tax statutes a court must not extend their provisions by implications beyond the clear import of the language and *where there is doubt as to such a statute's scope, it should be construed most strongly in favor of the citizen and against the state."* (Emphasis supplied).

In regard to statutory provisions for *tax exemptions,* Judge Collins, for the Court, stated in *Suburban Propane Gas Corp. v. Tawes,* 205 Md. 83, 87, 106 A. 2d 119, 121 (1954):

> "Of course, tax exemption statutes are to be strictly construed in favor of the State. The taxing power is never presumed to be surrendered. Every assertion that it has been relinquished must, to be effective, be distinctly supported by clear and unambiguous legislative enactment. To doubt an exemption is to deny it."

The language important in the case at bar has to do with the *scope* of the tax and is to be most strongly construed in favor of the taxpayer and against the State. It is apparent that cases having to do with the construction of statutory provisions providing for *tax exemptions* are not helpful or authoritative in the case at bar.

In *Comptroller v. Joseph F. Hughes & Co., supra,* the Court followed *McShain,* and sustained that portion of Rule 70 of the Comptroller which provided that contractors performing work for non-profit religious, charitable, scientific, literary or educational institutions on a lump-sum basis are not required to pay the tax on materials and supplies incorporated into the job. Rule 70 did not involve the language being construed in the case at bar. It was urged on the Court that Rule 63 construing the language "to use or incorporate" to include consumed property was inconsistent with Rule 70. As the majority points out, the Court stated:

> "We find it unnecessary to pass upon the validity of this Rule." (Rule 63).

But the Court continued:

> "If we assume, without deciding, that it correctly interprets the statutory language, or that it is at least within the Comptroller's power of definition, it could not avail the appellee here. It may be noted that the construction turns on the words "to use or incorporate." But in any event, inconsistency in the treatment accorded different classes of taxpayers, whether due to legislative action or administrative interpretation, furnishes no ground for invalidating an interpretation which we find to be sound under the facts of the instant case." (Page 148 of 209 Md.; page 346 of 120 A. 2d).

In *Comptroller v. Crofton Co.,* 198 Md. 398, 84 A. 2d 86 (1951), the Court had before it a claim for refund of $182.49 under the Maryland Use Tax for slate which was not readily obtainable in Maryland and exempted under the provision of Sec. 310(f) of the 1951 Code if the tangible personal property "enters into the processing of or becomes an ingredient or com-

ponent part of the product or service which is manufactured, compounded or furnished * * *." The trial court had held that the construction of a house was a "manufactured" product. The Comptroller appealed. There was no appearance by the appellee. This Court reversed, holding that the construction of a house was not a product which was manufactured or compounded and hence was not within the scope of the *exemption provision* of the Maryland Use Tax. The quotation in the majority opinion taken from the Court's opinion in *Crofton* begins: "As the Attorney General points out," and then follows the rest of the quotation. The majority has inserted parenthetically in the quotation "Judge Markell had earlier indicated that Sec. 259(f) of the sales tax act and Sec. 309(d)(2) and (3)-(2) of the use tax act were essentially identical." My reading of the opinion in *Crofton* does not disclose this. Judge Markell, for the Court, does state that:

> "*An* obvious purpose and effect of the use tax is to complement the retail sales tax (Article 81, secs. 259-307, Code, 1947 Supp.; Acts of 1947, ch. 281; 1947 Sp. Session, ch. 2; as subsequently amended) by imposing, in respect of purchases made outside Maryland (and therefore not subject to the sales tax) for use in Maryland, a compensating use tax and *thereby avoiding unfair discrimination and promoting equality between Maryland dealers and dealers in other states, and between purchasers in Maryland and purchasers outside Maryland for use in Maryland.*" (Emphasis supplied). (Page 400 of 198 Md.; page 87 of 84 A. 2d).

He does state that Section 259(f)(3) of the Retail Sales Act is identical with Section 308(h)(2) of the Maryland Use Tax. As has already been pointed out, however, there are substantial differences in language between the presently relevant sections of the Retail Sales Act and similar provisions in the Maryland Use Tax, and these differences avoid unfair discrimination between Maryland producers and out-of-state producers. The issue in the case at bar was not involved in *Crofton,* and was not argued or briefed in the Court of Appeals. There is

no legal requirement that the two acts be "parallel" and as we have seen in various provisions *they are not parallel.* If this *dictum* supports the majority's construction at all, it is at best a frail and incorrect *dictum,* and one to which this Court did not refer in the subsequent case of *Comptroller v. Hughes, supra,* in which the Court found it unnecessary to pass upon the validity of Rule 63 but assumed *arguendo* that Rule 63 was valid.

In *Baltimore Foundry & Machinery Corporation v. Comptroller,* 211 Md. 316, 127 A. 2d 368 (1956), the Court held that patterns purchased by the taxpayers for the purpose of resale as well as to make castings for sale to the customer were exempt from the sales tax by virtue of then Sec. 320(f), now Sec. 324(f). In paraphrasing the definition, the Court did use the language "for the purpose of resale in its original form, *or for the purpose of incorporation into a finished product*" to make the point that the definition provided an exclusion from taxation to be liberally construed in favor of the taxpayer and not an exception to be strictly construed against the taxpayer. It had nothing to do with the distinction between "to use" or "to incorporate" and indicates no opinion whatever on this distinction.

In *Comptroller v. Fairchild Engine & Airplane Corporation,* 227 Md. 252, 176 A. 2d 210 (1961), the Court was only dealing with materials incorporated into missiles sold to the Government for testing. The case did not involve the "to use" or "to incorporate" distinction. Judge Henderson, for the Court, sets forth the language of the "use" definition in the Maryland Use Tax and stated: *"Almost* identical language is used in Code (1957), Art. 81, Sec. 324(f) in regard to sales at retail, and we shall treat the two together. The taxes are, of course, complementary." (Emphasis supplied). He did not say that the two provisions *were wholly or entirely identical,* but almost identical, no doubt perceiving the difference important in the case at bar, but entirely unimportant in *Fairchild.* The *dictum,* such as it is, seems to me to tend to support the "use-incorporate" distinction in the Retail Sales Act rather than the contrary.

The majority also relies on *Briggs Co. v. District of Columbia,* 196 F. 2d 241 (D.C. Cir. 1952), but in that case

Circuit Judge Fahy, for the United States Court of Appeals for the District of Columbia, pointed out that the Regulations in the District of Columbia indicated that "use" and "incorporate" were synonymous as used in the District of Columbia statute.[7] It was urged that in Maryland, Rule 63 had defined the words to include property consumed in the manufacturing process and that Congress, in adopting the same language, intended that the words be given that interpretation. In regard to this contention, Judge Fahy stated:

> "It is argued that a different result would be reached in Maryland. There a provision similarly worded had been enacted before passage of the District of Columbia statute. By rule and administrative interpretation Maryland had apparently excluded from the coverage of its statute property consumed in the manufacturing process. It is contended that since this occurred prior to enactment of the local statute Congress intended the latter to be similarly construed. But at least in the absence of a more settled interpretation, or one of high state judicial authority, we are free to apply the District statute differently. As we construe the situation the cellulose casings are not incorporated in the frankfurters or used as a material or part of them, though used or consumed in the manufacturing process. This conclusion is not free of doubt, but our view is that if the uncertainty is to be resolved as petitioner ably contends this should be done by clarifying legislation rather than by judicial interpretation." (Pages 243-244 of 196 F. 2d).

This clearly indicates to me that in the Court's opinion the result in Maryland would be quite different.

It does not appear to me that the Comptroller's inartistic use of the phrase "has *extended* 'materials which are purchased for incorporation into a product produced for resale' to include such materials as are consumed in producing for sale products by manufacturing," etc., in his bulletin issued to explain Rule 63

---

7. See Note 3 on page 243 of 196 F. 2d 241.

has the sinister implication of usurpation of legislative power suggested in the majority opinion. It is quite clear from the language of Rule 63 that it was a definition of the whole phrase beginning "or to use or incorporate." It was a shortened form of saying the same thing in language laymen would readily understand as an authoritative result.

Finally on this aspect of the case, I think it most unfortunate and impermissible for the majority to give weight and effect to the statements made by one of the counsel for the Comptroller in the closing argument in the case in regard to the alleged purpose of the Comptroller in promulgating Rule 63 to appease the coal interests who were threatening an attack on the Retail Sales Act which was thought to have a defective title, so that litigation could be avoided before the defect in the title could be cured by subsequent legislation. There was no statement, however, that this interesting motivation was brought to the attention of the General Assembly when the subsequent amendments to the Retail Sales Act were proposed or even that this purpose was the *only* purpose which the Comptroller had in mind in the promulgation of Rule 63. Rule 63 indicates the contrary. It is in general terms. "Coal" is only used as an example of one of its applications, not as the *sole application*. More importantly, after "coal" was added to the specific exclusions by legislation within months after Rule 63 was promulgated, Rule 63 was not rescinded or modified by the Comptroller which would have obviously been the proper procedure if the appeasement of the coal interests had been its *only purpose* and those interests were fully protected by the amendatory legislation. To permit Rule 63 to continue for 18 years as applicable to *all* taxable personal property consumed in the manufacturing process clearly indicates to me that the purpose of Rule 63 was of general application and was not aimed *entirely* at the specific "coal problem."

But far more importantly, the statements of counsel and no testimony of like character appeared in the record made before the trial court and, of course, do not appear in the record on appeal. The statements did not emanate from a witness, duly sworn, and subject to cross examination. The statements involved a transaction 18 years ago and however eminent, knowl-

edgeable, and well qualified counsel may be, his statements in appellate argument, not agreed to by opposing counsel, can hardly qualify as evidence.

We have often held that a matter not raised in, or considered by, the trial court, but presented for the first time on appeal will not ordinarily be considered. *Meyers v. Jacham Enterprises, Inc.,* 225 Md. 86, 169 A. 2d 415 (1961), and cases cited therein. This is provided in Maryland Rule 885. This is a most salutary rule and should have been applied in the matter under discussion.

I would affirm Judge Sodaro's judgment reversing the decision of the Comptroller with respect to the claim for $1348.50.

In regard to the $970.84 claim, I concur in the reversal of the trial court. This concurrence in the result, is upon a ground not reached by the majority because of its decision in regard to the construction of the statute. The notice of assessment on the $970.84 claim was dated June 13, 1963. It was sent by certified mail with a return receipt requested to the taxpayer, Bloomingdale Rubber Company, P. O. Box 191, Aberdeen, Maryland. The assessment contained the following statements:

> "In order to avoid further imposition of interest and penalty this amount must be paid directly to the attention of the undersigned, at 301 W. Preston Street, Baltimore 1, Maryland on or before July 12, 1963."
>
> "If no application for revision is made within thirty days of the date of this notice, the assessment will become final."

The return receipt was signed:
> "American Cyanamid—Bloomingdale Dept.
> William G. Court, 6-14-63"

The assessment was for the period January 1, 1962 through April 11, 1963. No protest was made until July 17, 1963, 4 days after the 30 day statutory period for protest provided for in Article 81, Sec. 351(a) of the Maryland Code, which provides:

> "§351(a) Any taxpayer may apply to the Comptroller for revision of the tax assessed against him by

the Comptroller within 30 days of the date on which the Comptroller mails a notice of the assessment to the taxpayer's last known address. *If no application for revision is made within the aforesaid 30-day period, the assessment shall become final and no application for revision shall be considered by the Comptroller unless made within that period.*

"If the assessment is paid by the taxpayer, no application for refund shall be considered by the Comptroller unless made within 30 days of the mailing of the notice of assessment.

"When application for revision of refund or assessment, as the case may be, is made within the 30-day period, the Comptroller shall promptly act thereon and shall notify the taxpayer of his action.

*"Within 30 days of the mailing of the Comptroller's notice of his action upon the taxpayer's application for revision or refund of an assessment or upon 30 days from the mailing of notice to the taxpayer as provided for by §349 of this subtitle, the taxpayer may request a formal hearing before the Comptroller.* Thereupon, after reasonable notice to the taxpayer, the Comptroller shall grant such hearing." (Emphasis supplied).

This language is mandatory and the proper and efficient operation of the Retail Sales Act requires that this provision be strictly enforced. The appellees urge that there has been a "substantial compliance" with Sec. 351(a) because of the following stipulated facts: By a letter dated May 17, 1963, Bloomingdale notified the Comptroller that American Cyanamid had purchased Bloomingdale's assets and had assumed its liabilities. Bloomingdale at that time had already seasonably protested the assessment based on Bloomingdale's purchases of aluminum from July 1, 1956 through December 31, 1961 and had claimed a refund. As a result of the notice of May 17, 1963, the Comptroller had made an additional audit for the period January 1, 1963 through April 30, 1963 on the basis of which the assessment described in the notice of June 13, 1963 was made and

sent to Bloomingdale. If the notice had been sent to American Cyanamid it would have been seasonably protested. Because it was sent to Bloomingdale, it was held, unopened in accordance with the office practice, until Philip Golbin returned from Europe on June 24, 1963.

As Bloomingdale had filed the reports and paid the tax, the deficiency was properly levied against it as the taxpayer. See Sec. 324(q) of Art. 81. There can be no doubt that the notice was received by both American Cyanamid and Bloomingdale. The return receipt is signed "American Cyanamid—Bloomingdale Dept." The Comptroller cannot be charged with knowledge of the internal procedure of American Cyanamid or of Bloomingdale in regard to the opening of mail. Then too, Mr. Golbin returned from Europe on June 24, 1963 or 19 days before the final date to challenge the assessment.

There is, however, no provision in the law for "substantial compliance" or for the equitable considerations which appear in this case as possibly overcoming the requirement of Sec. 351(a). "All refunds of State taxes are matters of grace with the Legislature." *Wasena Housing Corp. v. LeVay,* 188 Md. 383, 389, 52 A. 2d 903, 906 (1947). The refund is conditioned upon the making of an application for refund within the 30 day period. When it is not made, the statutory right to refund no longer exists.